IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-00809-MSK-MJW

FIFI MENO INGILA,

     Plaintiff,

v.

DISH NETWORK LLC,

     Defendant.

---

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
---

     **THIS MATTER** comes before the Court pursuant to Defendant Dish Network, LLC's ("Dish") Motion for Summary Judgment **(# 67)**, Ms. Ingila's response **(# 76)**, and Dish's reply **(#80)**; and Ms. Ingila's Motion for Summary Judgment **(# 70)**, to which Dish filed no formal response (although the Court treats Dish's reply in support of its own motion as simultaneously responding to Ms. Ingila's motion).

### FACTS

     The Court briefly summarizes the pertinent facts here and elaborates as necessary in its analysis. Ms. Inglia, a black woman, was hired by Dish in or about 2008 as a Customer Service Representative. She contends that, during her tenure, co-workers referred to her as "Oprah," "Winnie Mandela," and "Aunt Jemima," and would kick her chair. Ms. Ingila contends that she complained about this treatment to Dish management, but no corrective action was taken against the co-workers. Ms. Ingila filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") in January and February 2010. Thereafter, she contends

that co-workers would make comments to her such as "haven't you quit yet?" or "I thought they fired you."  Ms. Ingila's employment was terminated by Dish on July 13, 2011.  Dish contends that, on that date, Ms. Ingila got angry at a co-worker for talking too loudly and threw a bottle of water at him; Ms. Ingila contends that she accidentally spilled some water on the co-worker when the bottle slipped out of her hand.

Ms. Ingila, then-represented by counsel, commenced this action in March 2013 with a lengthy Complaint (**# 1**) setting forth claims sounding in racial harassment and race discrimination under Title VII of the Civil Rights Act, race discrimination in violation of 42 U.S.C. § 1981, and various claims arising under the Americans With Disabilities Act (relating to Dish's alleged refusal to accommodate her disabilities of Post-Traumatic Stress Disorder and diabetes, among others).  However, in a subsequent Second Amended Complaint (**# 11**), Ms. Ingila's counsel abandoned all of these claims except a single claim under 42 U.S.C. § 1981, alleging that Dish engaged in "racial discrimination and . . . retaliatory acts" in violation of that statute.

Dish moves for summary judgment (**# 67**), arguing: (i) no § 1981 claim is cognizable given the absence of a contractual relationship between Ms. Igila and Dish; (ii) as to any disparate treatment claim, Ms. Ingila cannot show that she suffered an adverse employment action other than her termination, (iii) she cannot establish a *prima face* case of disparate treatment because she cannot show that her termination occurred in circumstances giving rise to an inference of discrimination, and even if she can, she cannot show that Dish's proffered reason for that termination is pretextual; (iv) to the extent she asserts a claim of racial harassment, she cannot show racially-harassing conduct of sufficient severity and pervasiveness, and cannot show a basis for attributing liability for any such conduct to Dish; and (v) to the extent she

2

asserts a retaliation claim, she cannot show a *prima facie* case due to the absence of any causal connection between her protected activity and any adverse action, and, even if she can, she cannot show that Dish's proffered explanation for its action is pretextual.

Ms. Ingila, now proceeding *pro se*, filed her own summary judgment motion **(# 70)**, although a great deal of that motion is directed at claims that are no long extant, such as her disability discrimination claims, or addresses irrelevant collateral issues.  Accompanying that 13-page motion are more than 120 pages of unsorted exhibits and three full deposition transcripts, only some of which are mentioned (much less specifically cited-to) in Ms. Ingila's motion.

## ANALYSIS

### A.  Standard of review

#### 1.  Summary judgment

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita,*

226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th

Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one

does not require the grant of another.").

2. <u>*Pro se* litigants</u>

Ms. Ingila appears *pro se*.  In considering her filings, the Court is mindful of his

*pro se* status, and accordingly, reads her pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519,

520-21 (1972).  However, such liberal construction is intended merely to overlook technical

formatting errors and other defects in Ms. Ingila's use of legal terminology and proper English.

*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  *Pro se* status does not relieve Ms. Inglia

of the duty to comply with the various rules and procedures governing litigants and counsel or

the requirements of the substantive law, and in these regards, the Court will treat Ms. Ingila

according to the same standard as counsel licensed to practice law before the bar of this Court.

*See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455

(10th Cir. 1994).

**B.  Dish's Motion**

Dish's initial argument is that a claim under 42 U.S.C. § 1981 cannot lie in the absence of

a contractual relationship between the parties.  Dish further contends that, because Ms. Ingila

was an at-will employee with Dish, there was no contract between them.  The Court summarily

rejects this argument.  Colorado law recognizes that "employment at-will is a continuing contract

between an employer and an employee that is terminable at the will of either the employer or the

employee."  *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011).

Because the employment at-will relationship is contractual in nature – albeit a contract that either

side may terminate at any time without notice or cause – Ms. Ingila's employment relationship with Dish was protected by 42 U.S.C. § 1981. The Court thus turns to her substantive claims.

       1. <u>Disparate treatment claim</u>

42 U.S.C. § 1981 prohibits discrimination on the basis of race in the making of and enforcement of contracts, including employment contracts. Claims of disparate treatment in employment under § 1981 are analyzed using the familiar *McDonnell-Douglas* burden-shifting framework. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225-26 (10th Cir. 2000). Accordingly, Ms. Ingila bears the initial burden of establishing a *prima facie* case of discrimination by showing: (i) that she belongs to a protected class, (ii) she suffered an adverse employment action, and (iii) that adverse action occurred in circumstances giving rise to an inference of race discrimination. *Id.* If she carries that burden, Dish is obligated to articulate a legitimate, non-discriminatory reason for the adverse action, and Ms. Ingila bears the burden of proving that Dish's proffered explanation is a pretext for race discrimination. *Id.*

       a. <u>adverse action</u>

Dish argues that the only cognizable adverse action asserted by Ms. Ingila is her termination in July 2011. It notes that Ms. Ingila complains about other incidents of her employment, including being reprimanded for having a cell phone at work, having a request for a schedule change refused, being issued verbal warnings for performance issues, and allegedly having her attendance records "falsified." Dish contends that these events, even if they occurred as alleged by Ms. Ingila, are not sufficiently material to amount to actionable adverse employment actions for purposes of a disparate treatment claim, as they did not result in a material change in the terms or conditions of Ms. Ingila's employment.

An actionable adverse action is one that causes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007). Mere annoyances, rudeness or petty slights by co-workers or supervisors, or informal discipline that has no material effect on the employee's employment prospects are not generally considered adverse actions. *See e.g. Steele v. Kroenke Sports Enterprises, LLC*, 264 Fed.Appx. 735, 746 (10th Cir. 2008) (unpublished).

It is difficult for the Court to ascertain Ms. Ingila's position on this issue. The document docketed as her response **(# 76)** to Dish's motion is a three-page filing that addresses a handful of unrelated factual issues. Ms. Ingila's own motion **(# 70)** is difficult to follow, both due to punctuation and grammatical defects and its general stream-of-consciousness nature. Ms. Ingila sometimes refers to incidents that may be those cited by Dish – *e.g.* an incident in which managers "told me that I did not follow [company policies] on a customer call and threatened to fire me the next day if I did not sign a memo that they had talked to me about this issue" may be the same incident which Dish characterizes her as receiving a verbal warning for performance issues – but the motion does not provide meaningful detail about the event, much less respond to the particular legal issue of whether such events had a material effect on the terms and conditions of her employment.

Although this Court construes Ms. Ingila's *pro se* filings liberally, Ms. Ingila is nevertheless required to specifically inform the Court of the facts she intends to rely upon, to cite the Court to the evidence in the record establishing those facts, and to advise the Court of her position on issues of law. To the extent that there are pertinent facts buried within the more than 100 pages of exhibits tendered by Ms. Ingila, Ms. Ingila's filings do not give the Court

meaningful direction in locating them.  The Court is unwilling to canvass the record on Ms.

Ingila's behalf, as doing so would essentially require the Court to marshal Ms. Ingila's evidence

and construct her arguments for her.  That is not the proper role of the Court.  *See Adler v. Wal-*

*Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).  Because Ms. Ingila's filings do not

facially identify any other employment actions taken against her by Dish that could arguably be

said to constitute materially adverse actions,[1] the Court agrees with Dish and will consider Ms.

Ingila's termination as the only colorable adverse action alleged herein.

> b.  <u>pretext</u>

Although Dish argues that the circumstances surrounding Ms. Ingila's termination do not

give rise to an inference of discrimination, such that she fails to even establish a *prima facie*

case, the Court finds it more productive to proceed to the final step of the analysis, examining

whether Ms. Ingila can show that Dish's proffered explanation for her termination is a pretext for

race discrimination.

Taking the evidence in the light most favorable to Ms. Ingila (except as noted), the

incident leading to her termination is as follows.  On July 11, 2011, near the end of her shift, Ms.

Ingila became irritated at co-workers who were talking and laughing loudly near her work

station.  Ms. Ingila asked them to keep it down, but they did not comply.  Ms. Ingila got up from

her desk, gathered together some documents and a bottle of water, and intended to go to the

Human Resources office to complain about the co-workers.  As she passed the co-workers, she

---

[1]      At best, Ms. Ingila discusses an incident in which she was counseled for not following company policies on a call.  She states that she was required to "sign a memo that they had talked to me about this issue."  She signed the memo.  The following day, she asked her supervisor for a copy of the memo, but the supervisor tore up the memo and threw it in the trash. Ms. Ingila does not allege that this incident had any lasting consequences with regard to her employment.

stated to them that she was going to report them to Human Resources, and in doing so, gestured in the direction of the HR office.  Unbeknownst to her, the cap on Ms. Ingila's water bottle was loose, and in the course of gesturing towards the Human Resources office, water splashed out of the bottle and onto her co-worker, Elijah Davison.  It appears that Ms. Ingila then proceeded to the HR office, but the record does not reflect what she said or did upon arriving there.  It appears to be undisputed that, at some point, she was told by Human Resources Manager Jennifer Quinby that she was being suspended (apparently with pay) pending an investigation into the incident.

Ms. Quinby offers a slightly different version of events.  She contends that Ms. Ingila "came into my office and reported to me that she had 'dumped' her water bottle over the head of [Mr. Davidson], allegedly because he was provoking her."[2]  Ms. Quinby states that she investigated the matter and was told by Mr. Davidson and other witnesses that they were unaware of Ms. Ingila's presence until she "suddenly stood up, yelled profanities, and threw her water at Mr. Davidson."[3]

---

[2]    The skeletal record here does not contain an affirmative denial by Ms. Ingila of this contention.  However, in her own motion, Ms. Ingila states that Ms. Quinby "never or did not give [me] the chance to speak, I was not allowed to explain to her what happened and was told to leave the building immediately."  (In an unemployment insurance hearing, Ms. Ingila did testify that she told Ms. Quinby that "water was spilled,' but says that Ms. Quinby then told her to calm down and eventually sent her home without discussing the matter further.)  The Court will assume, then, that Ms. Ingila denies admitting to Ms. Quinby that she "dumped her water bottle over" Mr. Davidson's head.

[3]    Mr. Davidson's version of events is that Ms. Ingila (who he had never met before) yelled at him something to the effect of "you keep making fun of me," that she "thrust" the open bottle of water towards him, and then told him "you go to HR" (which he understood as a command to him, but conceded that Ms. Ingila may have intended to say that she was going to HR).  Mr. Davidson did not report Ms. Ingila using profanity.

Handwritten notes (apparently by Ms. Quinby from her investigation) indicate that an employee named Zachary Thompson reported that Ms. Ingila stated (after throwing the water), "go to HR and get me fucking fired."

On July 13, 2011, Ms. Quinby and Danny Le, Ms. Ingila's manager, decided that Ms. Ingila had "used profane and inappropriate language and disposed the contents of her personal beverage on a coworker's person."  Considering that action to constitute "threats and violence" in violation of Dish's company policies, coupled with a "recurring pattern" of Ms. Ingila having "altercations with her coworkers including raising her voice, making threats of harm, and use of profanity/inappropriate language," Ms. Quinby and Mr. Le decided that Ms. Ingila should be terminated.

Based on this record, the Court finds that Ms. Ingila has not demonstrated a triable issue of fact as to whether Dish's proffered reason for her termination is actually a pretext for race discrimination.  In doing so, the Court is particularly mindful of the fact that the pretext inquiry focuses on "the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation."  *Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013).  In other words, "the relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."  *Id.*  Thus, Ms. Ingila's version of events ma actually be what happened, yet Ms. Ingila's claim would still fail even though Ms. Quinby made a mistake in concluding otherwise; what Ms. Ingila must show is that <u>Ms. Quinby herself</u> actually believed Ms. Ingila's version of events, but nevertheless chose to adopt a different version of events because of her racial animus against Ms. Ingila.

With this difficult burden to overcome, Ms. Ingila fails.  Even assuming that Ms. Ingila is correct -- that she never spoke, much less confessed, to Ms. Quinby about this incident -- Ms.

---

An e-mail to Ms. Quinby from Chris Witkop, the person Mr. Davidson was talking to at the time of the incident, relates Mr. Witkop's recollection that Ms. Ingila stated "Don't come over here and fuck with me on my phone calls . . . go to HR, I don't care."

Ingila does not dispute that Ms. Quinby talked to other witnesses to the incident and that all three reported facts suggesting that Ms. Ingila's actions were intentional.  Thus, Ms. Quinby's conclusion that Ms. Ingila had purposefully assaulted Mr. Davidson, even if mistaken or made without the benefit of Ms. Ingila's version of events, appears to have been made in good faith based on the information obtained by Ms. Quinby.[4]  Ms. Ingila has not identified any facts that would suggest that Ms. Quinby (or Mr. Le, for that matter) harbored any particular racial animus; she does not, for example, accuse Ms. Quinby of making racially-charged comments, of providing favorable treatment to white employees who engaged in allegedly similar conduct, or of deviating from company policies.[5]  At best, Ms. Ingila offers vague accusations that other supervisors and managers failed to adequately respond to her complaints about harassment from other employees or made false notations in Ms. Ingila's records.  Because Ms. Ingila has not come forward with evidence sufficient to raise a genuine dispute of fact as to whether the decisionmakers regarding her termination – Ms. Quinby and Mr. Le – harbored racial bias and

---

[4]  Indeed, even Ms. Ingila's version of events is consistent with most aspects of the other witnesses' versions.  Ms. Ingila admits that she was angry at Mr. Davidson and the others for talking loudly, that she verbally confronted them, and that she gestured at them with enough force to cause the cap on her water bottle to come off.

[5]  Exhibit G to Dish's motion is a portion of Ms. Ingila's responses to interrogatories, prepared by Ms. Ingila's former counsel.  In those responses, Ms. Ingila alleges that "In 2011, Danny Le falsified Plaintiff's attendance records (spanning 2010 to 2011) and wanted Plaintiff to sign the falsified records.  However, after signing, Plaintiff took the records to Scott Sorensen who reviewed the records with Plaintiff and found numerous discrepancies."

Ms. Ingila's *pro se* summary judgment motion/response mentions that "Danny Lee premeditated to fire me because he falsified information about my attendance record made me sign after I investigate with the General Manager Scott Sorenso that was a false accusation he falsified my attendance record.  I asked him why Danny Lee did that?"

Beyond these allegations, Ms. Ingila offers no particular explanation of the incident with her allegedly-falsified records, nor does she identify facts that would suggest that Mr. Le's "falsification" of the records was motivated by racial animus, nor indicate facts suggesting that Mr. Le harbored any personal (much less racial) animus towards Ms. Ingila as a result of this matter.

acted on that bias, Dish is entitled to summary judgment on Ms. Ingila's disparate treatment claim.

    2. Retaliation claim

A similar analysis results in summary judgment to Dish on Ms. Ingila's claim that her termination was retaliatory. To prove a retaliation claim under § 1981, Ms. Ingila must first establish a *prima facie* case by showing: (i) that she engaged in protected activity; (ii) that she suffered an adverse employment action; and (iii) that there is some causal connection between the protected conduct and the adverse action. If she carries this burden, Dish must articulate a legitimate, non-retaliatory reason for the adverse action, and Ms. Ingila bears the ultimate burden of proving that Dish's proffered reason is a pretext for retaliation. *Davis v. Unified School Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014).

It is undisputed that Ms. Ingila engaged in protected conduct on two occasions in 2009 and 2010. First, on or about December 24, 2009, she filed a charge of discrimination with the EEOC. It does not appear that this charge is in the record before the Court; it may be that the charge concerned a prior supervisor's refusal to accommodate Ms. Ingila's medically-based request for a different schedule. Ms. Ingila filed a second charge of discrimination with the EEOC on or about February 23, 2010, alleging that she was being harassed by her co-workers and management for filing the 2009 charge and that co-workers "mock my African heritage and accent." In addition, the record reflects that Ms. Ingila made frequent complaints to Ms. Quinby and other managers about difficulties she was having with her co-workers, although the record regarding these complaints is more ambiguous, both as to the timing and contents of such complaints.

The Court finds that an extensive analysis of Ms. Ingila's ability to establish a *prima facie* case is difficult, given the absence of specific factual detail in the record concerning her actual protected activities. But ultimately, it is unnecessary, as the Court finds that Ms. Ingila has not come forward with facts that would demonstrate that Dish's decision to terminate her employment was a pretext for retaliation in any event.[6] As discussed above, the record reflects that Ms. Quinby conducted some degree of investigation into the water-spilling incident and chose to credit the statements of several disinterested witnesses who accused Ms. Ingila of acting intentionally. Ms. Ingila has not pointed to any facts that would suggest that Ms. Quinby (or Mr. Le) harbored any particular animus towards Ms. Ingila individually, or employees who lodged complaints of discrimination or retaliation generally, such that the decision to terminate Ms. Ingila would have been infected by such considerations. The termination occurred nearly a year and a half after Ms. Ingila's last EEOC filing, and after she apparently made numerous complaints to Ms. Quinby and others over a span of several years, all of which suggest that the decision was not motivated by any particular complaint or series of complaints. Even if Ms. Quinby made a mistake in relying on the statements of the other witnesses, Ms. Ingila has not shown that such a mistake was not made in good faith by Ms. Quinby or that Ms. Quinby acted out of any intention to retaliate against Ms. Ingila. Accordingly, Dish is entitled to summary judgment on Ms. Ingila's retaliation claim as well.

3. Hostile environment harassment

Finally, the Court turns to Ms. Ingila's claim that she was subjected to a racially-hostile working environment in violation of 42 U.S.C. § 1981. The Court analyzes such a claim as it

---

[6]     To the extent Ms. Ingila is attempting to allege that other incidents – *e.g.* Mr. Le "falsifying" her attendance records – constitute discrete, actionable instances of retaliation, the Court finds that Ms. Ingila has not come forward with a factual record sufficiently developed to demonstrate any triable claim.

would a hostile environment claim under Title VII.  *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1152 (10th Cir. 2008).  Ms. Ingila must establish: (i) that she is a member of a protected class; (ii) that she suffered harassment, intimidation, and ridicule; (iii) that such harassment or ridicule was based on her race; (iv) that the harassment was so severe and pervasive, both objectively and subjectively, so as to alter the terms and conditions of her employment; and (v) that there is a basis for holding Dish responsible for such harassment.  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).   Because the harassment alleged here was perpetrated by Ms. Ingila's co-workers, the element of employer liability is established by Ms. Ingila showing that Dish had actual or constructive knowledge of the hostile environment and that it failed to take prompt and effective remedial action.  *Id.*

Ascertaining the specific factual contours of Ms. Ingila's hostile environment claim is somewhat difficult, due to the generalized and conclusory assertions in Ms. Ingila's filings, the lack of citations to specific supporting evidence, and the fact that the harassment alleged by Ms. Ingila appears to have been motivated by several types of animus.  Although not having particular evidentiary significance (it not being an affidavit or deposition or otherwise under oath), Ms. Ingila's counsel's response to interrogatories provides the most coherent summary of Ms. Ingila's contentions.  She asserts that, beginning around the time she filed her first EEOC charge in December 2009: (i) a person identified only as "Anna" (who was "an agent from Human Resources who sometimes worked on the customer service floor") started "calling Plaintiff 'Winnie Mandela' and 'Oprah' on the customer service floor"; (ii) that other employees, "including but not limited to Lynne Neese [and] Michael Houston soon followed suit"; (iii) that Ms. Ingila reported these incidents to her then-supervisor Keith Tierney, but that Mr. Tierney did nothing to resolve the issue; (iv) that on four occasions in August 2010, Ms. Ingila's car's tires

were slashed or otherwise vandalized in the Dish parking lot by unknown persons; (v) that "in 2010 and 2011, numerous [but unidentified] co-workers on the customer service floor would kick Plaintiff's chair while she was on the phone with a customer"; (vi) that unidentified co-workers would "provoke Plaintiff at work with statements such as 'that fucking bitch is still here' and 'they didn't fire you yet?'"; (vii) that Mr. Sorensen, the General Manager, "was present when other [unnamed] supervisors and managers would laugh and Plaintiff and mock her with statements such as 'look at the way she is sitting by herself . . . she doesn't have a friend'"; (viii) that two different employees [one named Yelitsa Laso, the other an unidentified "phone line customer and technician"] called her a "bitch" on separate occasions; (ix) that unknown persons caused her telephone to have "loud hang-ups . . . which gave her a headache"; (x) that she received "anonymous phone calls at work where the person on the other line would just say 'fuck you' and then hang up"; (xi) that Mr. Le falsified her attendance records in 2011; and (xi) the incident with Mr. Davidson that led to her termination.

The record is insufficiently developed to permit the Court to meaningfully evaluate most of these allegations. Beyond their mention in Ms. Ingila's response to interrogatories, they are either entirely unmentioned in Ms. Ingila's summary judgment motion/response, or they are recited only in generalized and conclusory terms, without citation to supporting evidence.[7] Facially, many of these allegations are unconnected to Ms. Ingila's race: allegations that she was

---

[7]     Ms. Ingila's *pro se* motion/response appears to reference additional allegations not mentioned in her counsel-drafted interrogatory responses. She mentions an incident in which a co-worker "came near to me in front of [a] manager to smell my head because I was wearing a wig and told me 'Tomorrow I will wear a wig just like you and my ass open just like you.'" (The latter comment appears to be a variation on alleged comments by other co-workers to Ms. Ingila about how they could see her underwear.) She mentions another incident in which a supervisor "approached me on 3/11/10 told me he will be conducting a feedback he as holding the area of his sex organ (phallus) during the time he was addressing me." These additional allegations do not alter the analysis or conclusions set forth herein.

called "bitch," that she was mocked for not having friends, that her car was vandalized by unknown persons, or that unknown persons would make prank calls to her have no inherent racially-charged component to them.  Although facially non-racial harassment can nevertheless make up part of a racially-hostile working environment, *Hernandez v. Valley View Hosp. Assn.*, 684 F.3d 950, 960 (10th Cir. 2012), nothing in the record suggests that these incidents were the work of the same perpetrators as the facially race-motivated conduct, much less that any non-race-based harassment was nevertheless the product of the perpetrator's racial hostility.  *See e.g. Winsor v. Hinkley Dodge, Inc.*, 79 F.3d 996,  Indeed, Ms. Ingila is unable to identify the perpetrator in most of these race-neutral incidents, making it impossible to draw any inferences that the harassing conduct was being directed at her <u>because of</u> her race.  *See e.g. Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998) ("If the nature of an employee's environment, however unpleasant, is not due to her [race], she has not been the victim of [race] discrimination as a result of that environment").

Thus, the Court primarily focuses its consideration to those allegations that are clearly racially-inspired: co-workers referring to Ms. Ingila with names like "Winnie Mandela" and "Oprah."  The record is somewhat unclear even on this point.  Dish has provided a portion of Ms. Ingila's deposition testimony addressing this issue (and Ms. Ingila's own submission offer no greater clarity).  Ms. Ingila testified that the situation began in or about late 2009, when a person she knows only as Anna "came back to me saying Oprah, Oprah, Oprah, Winnie Mandela.  And, you know, I thought it was a joke . . . And I find out it was continuously becoming a habit for them to call me Winnie Mandella or Oprah, and, you know, I tried to stop them."  Ms. Ingila does not elaborate on the context of Anna's statement, nor on the context in

which any other co-worker called her such names.  Her deposition testimony references only one

incident where the context of the "name-calling" can be even slightly ascertained:

> In 2011, Lynne Nesse came from HR.  She say, Oh, do you know
> the Oprah show that I saw yesterday?  She was just trying to talk
> out of nowhere, but I know she was provoking me, but I did not
> pay attention to that.  For me to look cuckoo in front of people like
> somebody is talking about Oprah when she saw me, and for me to
> direct that, you know—but I know she was just trying to push
> button, but I just let it go and left.
>
> . . .
>
> She say some Oprah show, it's like – you know, she started talking
> about it.  I didn't finish – she didn't finish all the phrases she was
> talking about.  I was coming by and I just continued to pass by.  I
> didn't say anything to her.

Ms. Ingila testified that she could identify two individuals (apparently in addition to Ms. Neese)

who called her names – Anna and Michael Houston, both of whom are black themselves,[8] but

did not know the name of any of the other co-workers who called her names.  Although asked

several times to estimate how often she was called names or to give a range of the name-calling's

frequency, Ms. Ingila stated that she didn't know.  Ms. Ingila was asked to opine as to why

people started to call her these names, and she appeared to state that she believed that it was

intended to serve as retaliation for her having requested a medical accommodation (or for having

complained about not receiving that accommodation), not because of her race:

> Q;  What do you think was motivating Michael Houston, Anna, or
> your other coworkers to call you Oprah or Winnie Mandela?
>
> . . .

---

[8]        Curiously, Ms. Ingila seemed to testify that she was on somewhat friendly terms with
both Anna and Mr. Houston: "Like I say, it's not just Anna and Michael.  Anna and Michael ---
because we were – I know them closely, like, a couple of times we went to lunch together . . .
But the rest of them, I don't know."

> A:  I give a letter saying that, you know, I feel kind of, you know, singled out.  I feel a little bit discriminated about them not providing my accommodation, and when I give the letter, Anna was in there.
>
> . . .
>
> So from Anna saying that, Oh, you give a letter to HR talking about discrimination to come call me Oprah, that mean there was something going on.

Taken as a whole and in the light most favorable to Ms. Ingila, the Court finds that the facts alleged fail to establish a genuine issue of whether a reasonable person would construe the name-calling to be sufficiently severe and pervasive as to alter the terms and conditions of employment.  Nothing in the record suggests that the references to Ms. Ingila as "Oprah" or "Winnie Mandela" were intended by the speakers to insult or demean Ms. Ingila.  Ms. Ingila offers no particular context in which the name-calling occurred, making it difficult for the Court to conclude that the speakers were attempting to demean or belittle her.  Indeed, persons such as Oprah Winfrey and Winnie Mandela enjoy a relatively positive public reputation; this is a far different case than might be presented had Ms. Ingila's co-workers called her by the names of notorious or unsavory persons. [9]  Although it may be juvenile and unprofessional for employees to call their co-workers by the names of prominent celebrities of the same race as that co-worker, without more context, a reasonable person would not consider that conduct to be severely and pervasively harassing.  *See Hernandez*, 684 F.3d at 957 (" run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces" is not actionable).

---

[9]      One could readily envision a context in which such name-calling began as or was intended to be complimentary towards Ms. Ingila: "your clothes are so nice, you dress as well as Oprah" or "I'm glad you're fighting for your rights, you're like the office's own Winnie Mandela."

Moreover, at least two of the known perpetrators, Anna and Mr. Houston, were themselves black. Although courts recognize the possibility that individuals of one race can engage in racial harassment of another person from that race, the races of Anna and Mr. Houston, coupled with the fairly benign character of the name-calling and its ambiguous meaning, calls into doubt whether a reasonable person in Ms. Ingila's situation would have considered these employees' name-calling to be severely offensive.

This is particularly illustrated by the one concrete example involving Ms. Nesse. As described by Ms. Ingila herself, it appears that Ms. Nesse was attempting to engage Ms. Ingila herself about an episode of the Oprah Winfrey TV. show. Ms. Ingila reflexively assumed that Ms. Nesse was trying to "provoke" her, but nothing in Ms. Ingila's description of the event gives any indication that an objective listener would have construed a seemingly ordinary topic of conversation to be such a provocation (particularly without any evidence in the record suggesting previous hostility by Ms. Nesse towards Ms. Ingila). Ms. Ingila does not describe Ms. Nesse as persisting in her attempt to speak to Ms. Ingila, after Ms. Ingila "just continued to pass by," nor does she recite any other instance in which Ms. Nesse again called her a name. Although Ms. Ingila seems to have genuinely subjectively believed that comments like this were severe and pervasive, the Court cannot say that a reasonable person in the same situation could have reached that conclusion. Ms. Ingila's failure to show facts that would lead a reasonable person to such a conclusion is fatal to her claim. *Hernandez*, 684 F.3d at

Accordingly, Dish is entitled to summary judgment on Ms. Ingila's hostile environment claim.[10]

---

[10] The Court need not reach the question of whether Ms. Ingila has shown facts sufficient to render Dish culpable for harassment perpetrated by her co-workers. Were the Court to do so, it would conclude that Dish made reasonable efforts to address the vague allegations made by Ms.

### C.  Ms. Ingila's motion

Because the Court finds that Ms. Ingila has not come forward with facts sufficient to establish a colorable claim under any theory of liability under 42 U.S.C. § 1981, it need not address Ms. Ingila's own summary judgment motion.

### CONCLUSION

For the foregoing reasons, Dish's Motion for Summary Judgment **(# 67)** is **GRANTED**, and Ms. Ingila's Motion for Summary Judgment **(# 70)** is **DENIED**.  The Clerk of the Court shall enter judgment in favor of Dish on all of Ms. Ingila's claims.

Dated this 14th day of February, 2015.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge

---

Ingila, but that Dish was unable to corroborate Ms. Ingila's vague allegations or identify the unknown perpetrators, and thus, could not take any effective remedial actions.  Mr. Sorensen testified that Ms. Quinby conducted an investigation into Ms. Ingila's allegations, but "we couldn't get any specifics and there was – people that were talking about her, we were unable to identify through names or a visual."